**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

MARION WALTON and ROSE ROWLEY,
Individually and on Behalf of All Others Similarly
Situated,

                  Plaintiffs,                CIVIL ACTION NO. _____

    v.

BANK OF AMERICA CORPORATION,        **JURY TRIAL DEMANDED**
and FIA CARD SERVICES, N.A.

               Defendants.

**CLASS ACTION COMPLAINT**

Plaintiffs Marion Walton and Rose Rowley, individually and on behalf of all others similarly situated (the "Class"), bring this Class Action Complaint ("Complaint") against Defendants Bank of America Corp. (referred to as "Bank of America" or the "Company") and FIA Card Services, N.A. (referred to as "FIA" or the "Company") (collectively referred to as "Defendants"). Plaintiffs seek certification of this action as a class action. Plaintiffs, by and through their attorneys, submit this Class Action Complaint (the "Complaint") against the Defendants named herein and allege as follows:

**NATURE OF THE ACTION**

1.      This class action involves Defendants' fraudulent course of conduct in marketing, selling, imposing, and/or administering products associated with their credit cards known as "Credit Protection," "Credit Protection Plus," or other similar monikers that all offer similar coverage (collectively referred to as "Credit Protection").

2.      Defendants violated Wisconsin statutory and common law by charging consumers for Credit Protection who either did not want or were not entitled to benefits from the service, and by the unfair, misleading, and bait-and-switch manner in which Defendants have administered claims for benefits by consumers.

3.      Defendants violated the law by the deceptive and misleading manner in which they offer the Credit Protection plan to consumers, and the manner in which they administer claims for benefits by consumers.

4.      Defendants market Credit Protection through direct mail and solicit Credit Protection customers over the phone.  They represent Credit Protection as a service that pays the required minimum monthly payment due on the subscriber's credit card account and the Credit Protection plan fee for a limited period of time under certain triggering situations, such as involuntary unemployment, illness, or changes in family status, thus preventing the account from becoming delinquent. Defendants' marketing for this product claims that "You've got help to stay on track when life gets expensive" and "Life is unpredictable.  Be prepared with Credit Protection Plus."[1] Among other things, Defendants promise that Credit Protection ". . . delivers the following:  ■ Peace of Mind ■ World Class Benefits. . ."

5.      However, Defendants misrepresent and/or fail to disclose the real nature of Credit Protection.  While representing to consumers that "Now Your Future Is More Secure", among other representations, in fact, despite its simple explanation for marketing purposes, Defendants' Credit Protection is a dense maze of limitations, exclusions, and restrictions, making it impossible for any reasonable consumer (to say nothing of those who did not even choose to enroll in the plan) to determine what Credit Protection covers and whether it would be a sound financial choice.

6.      Defendants make no effort to determine whether a cardholder is eligible for Credit Protection benefits at the time of sale. As a consequence, Defendants bill thousands of retired persons (many of whom are senior citizens), along with the unemployed, those employed by family members or self-employed, and part-time or seasonal Wisconsin residents, as well as disabled individuals, for Credit Protection coverage, even though their employment or health status prevents them from receiving benefits under the plan.

---

[1]*See*  https://www9.bankofamerica.com/insurance/protection/credit-protection/overview.go  (last  viewed on 11/12/10).

7.      Further, Defendants make no effort to determine whether subscribers become ineligible for Credit Protection benefits after they are enrolled in the plan. Accordingly, when subscribers' employment or health status changes, they will continue to pay for the product even though they may no longer be eligible for benefits under the plan.

8.      Defendants require customers to enroll in Credit Protection coverage *before* they provide subscribers with the terms and conditions of the plan.

9.      Given the confusing way the written materials present the terms and conditions of Credit Protection, it would be extremely difficult for a subscriber to decipher those provisions.

10.     Upon information and belief, Defendants have established their "customer service" support in such a way that subscribers cannot easily cancel the plan or receive answers to benefit questions. Further, upon information and belief, they have established their "claim filing" system in a way to make it difficult for subscribers to file claims or receive benefits for filed claims.

11.     Defendants do not refund Credit Protection premiums after they have denied subscribers' claims for Credit Protection benefits, nor do they address subscribers' continued obligations to pay the monthly fee for Credit Protection after a claim has been denied.

12.     Credit Protection is so confusing even as to those who enrolled on purpose as to when coverage is triggered, so restricted in terms of the benefits it provides to subscribers, and processing claims is made so difficult by Defendants, that the product is essentially worthless, to say nothing of those on whom Defendants imposed unauthorized charges.

13.     Despite this, Defendants charge exorbitant prices for Credit Protection, charging every month $0.95 for every $100 in unpaid balance. Thus a customer who carries a $100 balance for a year pays $11.40 per annum for Credit Protection, paying an additional 11.4 percent of balance on top of what he or she is already paying in interest.

14.     Defendants know that few those cardholders who choose to pay for Credit Protection will ever receive benefits under the plan and even for those who do receive benefits,

the amounts paid in "premiums" will usually exceed any benefits paid out, particularly given that Finance Charges accrue during the period of forbearance.

15.     As a result of their misleading and deceptive marketing practices in connection with sales of Credit Protection, Defendants have increased their profits by many millions of dollars, by selling a product that does not provide the benefits promised to thousands of Wisconsin residents who are nevertheless charged for the product month in and month out.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) and (6), in that:

    (a)     This is a class action involving 100 or more class members,

    (b)     Plaintiffs, Citizens of the State of Wisconsin, are diverse in Citizenship from Defendant Bank of America, which is incorporated in Delaware and has a principal place of business in North Carolina, and Defendant FIA Card Services, N.A., which is incorporated in Delaware and has a principal place of business in Delaware.

17.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

    (a)     The class, which includes an unknown number of persons but certainly more than 100, is so numerous that joinder of all members is impractical;

    (b)     There are substantial questions of law and fact common to the class including those set forth in greater particularity in Paragraph 85 herein;

    (c)     This case is properly maintainable as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

        i.     questions of law and fact enumerated below, which are all common to the class, predominate over any questions of law or fact affecting only individual members of the class;

        ii.     a class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

        iii.     the relief sought in this class action will effectively and efficiently provide relief to all members of the class; and

        iv.      there are no unusual difficulties foreseen in the management of this class action.

18.     The Court has personal jurisdiction over both Bank of America and FIA, which have at least minimum contacts with the State of Wisconsin because they have conducted business there and have availed themselves of Wisconsin's markets through their promotion, sales, and marketing efforts.

19.     This Court is a proper venue in which to bring this action, pursuant to 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claims occurred within the district in which this Court sits and both Plaintiffs reside in this district.

## **PARTIES**

20.     Plaintiff Marion Walton ("Walton") is a resident of Greenfield, Wisconsin. Since 2004, Ms. Walton has had a credit card in her name issued by Defendants bearing Credit Protection features. Ms. Walton has had the Credit Protection Plan on her credit card issued by Defendants, but has not received any benefit from her participation in Credit Protection.

21.     Plaintiff Rose Rowley ("Rowley") is a resident of Niagara, Wisconsin. Plaintiff applied for and received Credit Protection Plus on two of her credit cards issued by Defendants, but has not gotten any benefit from her participation in Credit Protection.

22.     Upon information and belief, Defendant Bank of America Corporation is a Delaware Corporation that maintains corporate headquarters in Charlotte, North Carolina.

23.     Upon information and belief, Defendant FIA Card Services, N.A. is a national banking association formerly known as MBNA America, N.A. ("MBNA"), and is a subsidiary of Defendant Bank of America. In 2006 Bank of America acquired MBNA, making it a wholly-owned subsidiary, and renamed it FIA. As such FIA markets, administers and finances credit card services for Bank of America. FIA's principal place of business is located in Wilmington, Delaware.

## FACTUAL ALLEGATIONS

24.     Defendants comprise one of the three largest general purpose credit card issuers in the United States, and in 2009 were third in the country in purchase volume for general purchase credit cards.  For the first six months of 2009, Defendants had 16% of the market share by credit card issuer.  Upon information and belief, Credit Protection is a profit center for Defendants and serves the Company's interest in generating fee income, to the detriment of its most vulnerable customers.

25.     Upon information and belief, Defendants offer Credit Protection to all their credit card customers, but aggressively market this product to vulnerable Wisconsin consumers who fall into the subprime credit category, or customers who have low credit limits because of impaired credit ratings.

26.     Defendants advertise their Credit Protection Plus program as "an important safety net" to protect consumers' credit card accounts with Defendants "when times get tough, or when you go through a major life event."  However, the terms of Defendants' Credit Protection program are varied, complicated and always changing. Nevertheless, all of the various plans provide for some form of benefit upon the occurrence of "protected events," including involuntary unemployment, hospitalization, disability, family leave of absence, and loss of life.  Credit Protection also provides payment for a limited period of time upon the occurrence of a "life event," defined as marriage, childbirth, adoption, college, a home move, and other life-changing events.

27.     Defendants represent that their Credit Protection Plan safeguards cardholders' accounts by allowing for a forbearance on monthly minimum payment obligations upon the occurrence of certain typical life events (illness, unemployment, etc.) or possibly total forgiveness of certain debt amounts in the event of death, both subject to extensive exemptions and exclusions set forth in the fine print of documents which consumers typically receive, if at all, only after enrolling in the plan.  During the forbearance periods, Defendants continue to assess Finance Charges, i.e., interest continues to accrue on the cardholders' account balance

(including interest accruing on the portion of the account balance resulting from the imposition of the Credit Protection Plan fee).

28.      Upon information and belief, Defendants are in possession of information, such as date of birth and name of last employer, which would assist Defendants in knowing whether a particular cardholder is eligible for Credit Protection.

29.      However Defendants make no reasonable efforts and undertake no investigation, including review of information in their possession regarding the cardholder, to determine if Credit Protection coverage would apply to the cardholder. Accordingly, Defendants engage in marketing to enroll individuals in Credit Protection even when they have information in their possession indicating that the product may have limited or no value to the consumer.

30.      Further, despite this broad marketing, the terms of Defendants' Credit Protection scheme are complicated and difficult for a layperson to understand.  The restrictions, limitations, and exclusions associated with "protected events" and the proofs required to establish them are expansive, confusing, and constantly evolving.

31.      The telephone marketing scripts and the written materials provided by Defendants are incomplete, indecipherable, misleading and obfuscatory.

32.      Nevertheless, Defendants require customers to enroll for Credit Protection coverage *before* it provides subscribers with the terms and conditions of the plan.

33.      Days or weeks after the sale of Credit Protection, Defendants may, *in some instances*, mail written material to the subscriber.  Given the confusing way the written materials present the terms and conditions of Credit Protection, it is extremely difficult for a subscriber to decipher those provisions.  According to the written materials, which are only provided after subscribers have already been enrolled in the plan, there are numerous restrictions and qualifications on Credit Protection coverage, but because these restrictions are in small print and in incomplete, indecipherable, misleading and obfuscatory language, they are not readily comprehensible to subscribers.  Thus, even if the subscriber is later provided with the written materials from Defendants, it is virtually impossible for the subscriber to determine all of the

exclusions and limitations of Credit Protection, or the value of the product, based on what is provided.

34.     After a subscriber is enrolled, the person may then affirmatively cancel the plan through what Defendants market as a "30-day review period."  Defendants shift their burden and duty of full disclosure prior to the sale to the customer, and require subscribers to decipher the terms of the product after it has already been purchased and to then take action to cancel it.  They characterizes this sales scheme as a review period during which consumers can cancel their enrollment within 30 days of the effective date and "any Plan Fees will be credited back to the Enrolled Account."  [*See* https://www8.bankofamerica.com/insurance/protection/credit-protection/overview.go?state=WI, last viewed on October 22, 2010.]   In fact, the obligation is affirmative: "You will be billed during the first 30 days; however, if you decide you do not want to keep the protection you have 30 days from the Effective Date to cancel and receive a full refund of the billed program fees." [*See* https://creditprotection.bankofamerica.com/faq/, last visited on October 22, 2010.]

35.     Defendants do not ask prospective subscribers whether they have certain characteristics or meet certain factors that would bar them from being eligible for benefits under Credit Protection, even though Defendants have a common practice of limitations on full coverage based on exclusions.

a.     For instance, upon information and belief, Wisconsin retired persons are charged for Credit Protection even though they are categorically excluded from receiving most or all of the benefits under the plan.  In fact, Defendants do not ask customers whether they are retired.

b.     Similarly, upon information and belief, the benefits for unemployment are limited to those receiving unemployment insurance benefits (although not all unemployed people are eligible for benefits) or, for self-employed, under certain specific instances.  Defendants do not ask customers whether they are self-employed or so-called independent contractors. Further, benefits for involuntary unemployment are limited for

unemployed persons, who are only eligible if the unemployment begins 60 days or more after the effective date of enrollment in Credit Protection and lasts for a minimum of 30 days, but Defendants nevertheless fail to affirmatively inform these individuals of the limitations in benefits when they are enrolled.

c.      Further, part-time or seasonal workers are also limited or categorically excluded from receiving benefits for loss of employment.  To qualify for benefits, one needs to work at least 1,000 hours per year.  However, upon information and belief, Defendants make no effort to investigate whether any of the Wisconsin consumers that pay for Credit Protection are part-time or seasonal.

d.      As another example, benefits for disability are limited for disabled persons, who are only eligible if the disability begins 60 days or more after the effective date of enrollment in Credit Protection and lasts for a minimum of 30 days, but Defendants nevertheless fail to affirmatively inform these individuals of the limitations in benefits when they are enrolled.

e.      For other protected events, such as hospitalization, family leave of absence, or loss of life, paid and enrolled customers are likewise not even eligible for benefits unless they have been enrolled for 60 days or more after the effective date of enrollment in Credit Protection, but Defendants nevertheless fail to affirmatively inform these individuals of the limitations in benefits when they are enrolled. Thus, as with benefits for involuntary unemployment or disability, paying customers are not even eligible for coverage unless they have already been paying Defendants for the program for two billing cycles. Defendants likewise fail to affirmatively inform these individuals of the limitations in benefits when they are enrolled.

36.      Upon information and belief, Defendants sell Credit Protection to, or imposed Credit Protection on, consumers through a number of different channels, including direct mail marketing, in which they may ask that the consumer "check the box" to initiate the plan, through telemarketing, where the consumer may be asked to press a button on the telephone keypad to approve initiation of the plan, through phone calls, where the consumer may

be asked to sign up when he or she activates the credit card, or through unilaterally imposing the Credit Protection feature on a consumer's credit card.

37.    Upon information and belief, Defendants impose charges for "Credit Protection" upon Wisconsin consumers even though individual consumers did not request the product or clearly assent to pay for the product in writing after having the opportunity to review its governing terms and conditions.

38.    In some instances, Credit Protection has been unilaterally imposed upon consumers. In other instances, no written materials explaining the terms and conditions were ever provided to subscribers. If Credit Protection is imposed and no written materials are provided, the only way subscribers could ever know they have been enrolled in Credit Protection and are being charged for this product is from noticing a line item fee listed on their monthly credit card statements. Even if Defendants sent written materials to consumers who did not enroll, they would have no reason to look for or review such materials.

39.    This form of enrollment, known as "slamming," can be undertaken in a number of different ways.[2]  However, every slamming victim was enrolled without their consent. That is, they did not agree to contract with Defendants for Credit Protection and did not assent to pay for Credit Protection, regardless of the terms and conditions of the plan.

40.    Credit Protection is so confusing as to when coverage is triggered, so restricted in terms of the benefits it provides to subscribers, and processing claims is made so difficult Defendants, that the product is essentially worthless.

41.    The cost of Credit Protection is a monthly charge of approximately $0.95 per $100 of a subscriber's month-ending credit card balance.

---

[2]      For a thorough explanation of how credit card companies "slam" customers with financial products like Payment Protection, see the Complaint filed by the Minnesota Attorney General against credit card issuer Discover Financial Services, attached hereto as Exhibit A.

42.     For example, if a credit card customer of Defendants' has a balance on a covered account of $10,000, as a Credit Protection subscriber, the customer could owe Defendants approximately $95.00 that month just for Credit Protection coverage.

43.     Credit Protection also provides the added benefit to Defendants of lowering the cardholder's available credit through the imposition of this additional fee. Further, the imposition of the fee creates a cycle of profitability for Defendants, in that the fee itself increases subscribers' monthly credit balances, which in turn increases Credit Protection fees in upcoming months.

44.     Further, when claims for Credit Protection benefits are denied, Defendants have not implemented a process through which subscribers' Credit Protection premiums are refunded, even if the subscribers are deemed to be ineligible for Credit Protection benefits.  In fact, if subscribers are denied Credit Protection benefits, Defendants neither affirmatively remove subscribers from Credit Protection enrollment going forward, nor is it Defendants' policy to inform subscribers of their continued obligations to pay for Credit Protection even though they have been deemed to be ineligible for benefits.

45.     Although heralded as coverage designed to protect a subscriber's credit card account "precisely during the times you need it most" and give subscribers "peace of mind protection for the unexpected," the Credit Protection device is designed to prey on the financially insecure and is virtually worthless because of the numerous restrictions that are imposed, because of the exclusions of benefits, and because of the administrative and bureaucratic hurdles that are placed in the way of Wisconsin subscribers who attempt to secure payments from Defendants under Credit Protection coverage.

46.     Defendants employ their superior bargaining power to unilaterally impose upon customers at the time of the sale of its Credit Protection Plus plan their so-called terms and conditions, which include an arbitration clause with a waiver of purchasers' class action remedies.  The terms and conditions, which are not contained in the Credit Protection Plus Addendum that purportedly amends customers' Credit Card Agreements with Defendants

(except for a general reference to arbitration) but rather in the general Credit Card Agreement, constitute contracts of adhesion.  In practice, the terms and conditions would operate to exempt Defendants from their responsibility for their own fraud and willful injury to their customers. Defendants' Credit Card Agreement, with its arbitration and class action waiver clause, is unconscionable and contrary to public policy and therefore is unenforceable against its customers.

47.     Defendants' Credit Protection policies and practices are both substantively and procedurally unconscionable in the following material respects, among others:

a.      Defendants do not provide the terms and conditions of Credit Protection to subscribers until <u>after</u> they have enrolled in the plan;

b.      Defendants make no effort and undertakes no investigation to determine if a cardholder would qualify for Credit Protection coverage;

c.      Defendants unilaterally impose Credit Protection upon some of their customers' credit card accounts, thereby failing to disclose to customers that Credit Protection is an optional plan and that they have the option to "opt out" of Credit Protection;

d.      Defendants did not obtain affirmative consent from some subscribers prior to enrolling them in Credit Protection;

e.      The written documents that Defendants do eventually provide to subscribers, referred to by Defendants as a welcome package, do not provide subscribers with sufficient information to understand the terms and conditions of Credit Protection;

f.      The welcome package and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendants, which are parties of vastly superior bargaining strength, and only relegate to the subscriber the opportunity to adhere to them or reject the agreement in its entirety;

g.      The welcome package and related documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading, in that they do not require affirmative customer consent (like a signature) and do not unambiguously state that

certain customers might be ineligible to receive benefits, even though Defendants have the information and means of determining eligibility prior to enrolling these customers in Credit Protection;

h.       Defendants do not alert customers that certain individuals are ineligible for certain Credit Protection benefits.

i.       The amount charged in fees for Credit Protection is not rationally related to the amount of value Credit Protection provides to subscribers, nor is the value of Credit Protection computable or discernable by subscribers;

j.       Defendants charge exorbitant fees for Credit Protection, much more than the value of the benefits offered or paid out to subscribers;

k.       The formula Defendants use to compute Credit Protection fees is misleading such that subscribers are unable to budget for this product or understand its overall cost in order to determine its value to subscribers; and

l.       Defendants make it difficult for subscribers to obtain information about the terms and conditions of Credit Protection coverage, file claims, or cancel enrollment or obtain a refund if they did not want to enroll, in order for Defendants to maximize the number of Credit Protection subscribers and minimize the amount of benefits it pays to these subscribers.

48.     Considering the great business acumen and experience of Defendants in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

49.     Plaintiffs and members of the Class have sustained damages as a result of Defendants' unconscionable policies and practices as alleged herein.

## FACTUAL ALLEGATIONS AS TO MARION WALTON

50.     Plaintiff Marion Walton is a 75 year old resident of Greenfield, Wisconsin.

51.     Since approximately 1999, Ms. Walton has had a credit card issued by Defendants. Ms. Walton's card was initially issued by FIA, at the time known as MBNA, and, with Bank of America's acquisition of MBNA, it became a Bank of America credit card in late 2006.

52.     In or about June of 2004, Ms. Walton was involuntarily enrolled by Defendants' in their credit protection plan. Ms. Walton never agreed to enrollment for Credit Protection coverage. Ms. Walton is a victim of "slamming;" she has never consented to Credit Protection coverage.

53.     Ms. Walton was the self-employed as the sole-proprietor of medical workplace consulting business at the time she became enrolled in Credit Protection. No one with Defendants ever asked Ms. Walton about her employment status before involuntarily enrolling her in Credit Protection.

54.     At the time Ms. Walton was involuntarily enrolled in Credit Protection, no one with Defendants explained the terms and conditions surrounding Credit Protection to her.

55.     Ms. Walton did not receive written materials explaining the terms and conditions of Credit Protection before being involuntarily enrolled in the program.

56.     Sometime after becoming enrolled in Credit Protection, Ms. Walton received the welcome package from Defendants with written materials outlining the plan.  These materials were confusing and unclear and in small print. Upon learning that she was enrolled in and paying for Credit Protection, Ms. Walton remained enrolled because she thought she would then be fully eligible for benefits.

57.     Ms. Walton only continued to pay for Credit Protection from Defendants because she expected that she would be eligible for the benefits touted by Defendants.

58.     At the time Ms. Walton was involuntarily enrolled in Credit Protection, no one with Defendants asked if she was self-employed or determined that she was self-employed, or made any inquiries about how many hours she worked per week or per year.  Ms. Walton was never told that being self-employed, or a determination of how much she worked per week or per year, could prevent her from being eligible for certain Credit Protection coverage or benefits, or could at least limit the availability of any coverage or benefits.

59.     Defendants never informed Ms. Walton that being self-employed by their definition would be a bar to, or severely limit, her receiving benefits under the Credit Protection plan. If she had known that she was going to be considered self-employed and that this would make her ineligible for, or severely limit, benefits under Credit Protection, she would not have enrolled.

60.     Ms. Walton has paid premiums of between $0.89 and $0.95 inclusive for every $100 monthly for her credit card issued by Defendants, and, upon information and belief, has paid, at a minimum, $3,600.00 in total for Credit Protection to Defendants over the last several years. The exact amount of Credit Protection charges made by Defendants, and paid by Ms. Walton, can be readily compiled and calculated by Defendants.

## **FACTUAL ALLEGATIONS AS TO ROSE ROWLEY**

61.     Plaintiff Rose Rowley is a resident of Niagara, Wisconsin.

62.     For the last several years, Ms. Rowley and her husband Jess Pike have had several credit cards issued by Defendants.  After receiving the credit cards in the mail, Ms. Rowley called to activate the cards.  At that time, Defendants enrolled her in the Credit Protection Plus plans.  Defendants used scare tactics to convince Ms. Rowley to enroll in Credit Protection, exhorting that she could have trouble paying her bills in the event of job loss or another major life event.  When Ms. Rowley would decline to purchase the Credit Protection, she felt pressured through later mailings or calls by representatives of Defendants to purchase it.

63.     Plaintiff purchased Credit Protection from Defendants because she expected that she would be eligible for the benefits touted by Defendants.

64.     Ms. Rowley was employed as a medical transcriptionist at the time she became enrolled in Credit Protection. No one from Defendants ever asked Ms. Rowley about her employment status before enrolling her in Credit Protection.

65.     At the time Plaintiff enrolled in Credit Protection, no one with the Defendants explained the terms and conditions surrounding Credit Protection to her.

66.     Ms. Rowley did not receive written materials explaining the terms and conditions of Credit Protection before being enrolled in the program.

67.     After becoming enrolled in Credit Protection, Ms. Rowley received the welcome package from Defendants with written materials outlining the plan.  These materials were confusing and unclear and in small print.

68.     Ms. Rowley only continued to pay for Credit Protection from Defendants because she expected that she would be eligible for the benefits touted by Defendants.

69.     After Ms. Rowley was let go from her position as a medical transcriptionist after approximately three years at the company, she applied to Defendants' Credit Protection to activate the benefits in summer 2010.  Her requests to Defendants were denied in August 2010 because Defendants determined that she was self-employed and her "unemployment was not caused exclusively by business bankruptcy, failure or loss of required equipment to conduct business, or damage to the business premises caused by fire, theft or natural disaster."

70.     At the time Plaintiff enrolled in Credit Protection, no one with Defendants asked if she was self-employed or determined that she was self-employed.  Ms. Rowley was never told that being self-employed could prevent her from being eligible for Credit Protection coverage or benefits.

71.     Ms. Rowley did not consider herself to be self-employed and did not believe she would be considered self-employed by the State of Wisconsin or Defendants.

72.     Defendants never informed Ms. Rowley that being self-employed by their definition would be a bar to her receiving benefits under the Credit Protection plan. If she had

known that she was going to be considered self-employed and that this would make her ineligible for benefits under Credit Protection, she would not have enrolled.

73.     Ms. Rowley and her husband have paid premiums of approximately $0.95 for every $100 monthly for each of their cards, and, upon information and belief, have paid approximately $20-30/month for all of their credit cards issued by Defendants for the last several years. The exact amount of Credit Protection charges made by Defendants, and paid by Ms. Rowley, can be readily compiled and calculated by Defendants.

74.     Defendants have not refunded the money Ms. Rowley paid towards her Credit Protection premiums after deeming her ineligible for benefits due to loss of employment, nor have Defendants affirmatively disenrolled Ms. Rowley from its Credit Protection plan due to her ineligibility to receive benefits.

## TOLLING OF THE STATUTE OF LIMITATIONS

75.     Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the facts as alleged herein.  Plaintiffs and members of the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true nature of the Credit Protection Plan.

76.     Defendants are and have been under a continuing duty to disclose to the Plaintiffs and the Class the true character, quality, and nature of the Credit Protection Plan. Because of their knowing, affirmative, and/or active concealment of the true character, quality and nature of the Plan, Defendants are estopped from relying on any statutes of limitation in their defense of this action.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action on their own behalf and on behalf of a class of all other persons similarly situated (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure.

78.     Plaintiffs bring this action as class representatives to recover damages and/or refunds from Defendants' breach of contract, breach of the covenant of good faith and fair dealing, unconscionability, fraudulent representations and deceptive trade practices in violation of § 100.18, Wis. Stats., intentional omissions and misrepresentations, injunctive relief and declaratory judgment, rescission, and restitution for unjust enrichment.

79.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a) and (b).

80.     Plaintiffs seek certification of a class comprised of the following Wisconsin citizens and consumers:

> All residents of the State of Wisconsin who paid for Credit Protection ("Payment Protection Subscribers") at all times the product was sold

81.     Plaintiffs seek certification of the following subclasses comprised of the following Wisconsin Citizens and consumers:

A.     All citizens of the State of Wisconsin who were not eligible for full benefits, or whose eligibility for benefits were limited by express exclusions, including but not limited to those Credit Protection Subscribers who were retired, self-employed or part-time or seasonal workers, or were disabled, either at the time that they were solicited for and made payments to Defendants for Credit Protection, or any time thereafter while continuing to pay for Credit Protection.

B.     All citizens of the State of Wisconsin who did not expressly consent to sign up and pay for Payment Protection.

82.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

83.     Excluded from the Class are:

a.     Defendants and any entities in which Defendants have a controlling interest;

b.      Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Defendants;

c.      The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d.      Persons or entities with claims for personal injury, wrongful death and/or emotional distress;

e.      All persons or entities that properly execute and timely file a request for exclusion from the Class;

f.      Any attorneys representing the Plaintiff or the Class; and

g.      All governmental entities.

84.     <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>.  The Class is comprised of over 100 people and possibly thousands of individuals who were customers of Defendants, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable and can be determined based on Defendants' records. In addition to records maintained by the Defendants and their agents, the Class members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means. The disposition of the claims of the proposed class members through this class action will benefit both the parties and the Court.

85.     <u>Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a.      Whether Defendants' sales, billing, and marketing scheme as alleged in this Complaint is fraudulent, deceptive, unlawful, and/or unfair in violation of Wisconsin law;

b.      Whether Defendants' Credit Card Agreement arbitration clause and class action waiver are unconscionable and therefore unenforceable as to Plaintiffs and the Class members;

c.      Whether Defendants' imposition of Credit Protection on individuals who did not sign up for it is unlawful;

d.      Whether Defendants' marketing of Credit Protection to individuals ineligible for certain benefits is misleading and/or in bad faith;

e.      Whether Defendants' administration of the Credit Protection program has been in bad faith;

f.      Whether Plaintiffs and the Class members are entitled to restitution of all amounts acquired by Defendants through their common and uniform scheme;

g.      Whether Plaintiffs and the Class members are entitled to the disgorgement of all fees wrongfully collected by Defendants;

h.      Whether Plaintiffs and the Class members are entitled to prospective injunctive relief enjoining Defendants from continuing to engage in the fraudulent, deceitful, unlawful, and unfair common scheme as alleged in this Complaint; and

i.      Whether Plaintiffs and the Class members are entitled to recover compensatory and punitive damages as a result of Defendants' wrongful scheme.

86.     <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>.  Plaintiffs assert claims that are typical of the entire Class, in that Plaintiffs paid for Credit Protection although it did not benefit them.

87.     <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>.  Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the Members of the Class they seek to represent.  Plaintiffs are represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire

Class.  Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

88.     <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Plaintiffs and members of the Class have suffered irreparable harm as a result of Defendants' fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class members' claims, no Class members could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**<u>COUNT ONE</u>**

**<u>BREACH OF CONTRACT</u>**

89.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

90.     Plaintiffs and other Class members purchased Credit Protection from Defendants with the justified expectation that they were eligible for the benefits offered by Defendants' Credit Protection plan, or were enrolled in Credit Protection without their assent.

91.     Plaintiffs contracted with Defendants for Credit Protection benefits, or were involuntarily enrolled in Credit Protection without their assent.

92.     Plaintiffs and other Class members paid monthly Credit Protection premiums, in some cases unknowingly, to obtain the purported benefits of Credit Protection.

93.     Upon information and belief, the terms and conditions of the agreement concerning the purchase of Credit Protection, including, but not limited to, the Credit Protection Plus Addendum, are embodied in written materials in the possession of Defendants.

94.     These terms and conditions were never provided to Plaintiffs and other Class members before they were enrolled for Credit Protection.  Some Class members never received these terms and conditions.

95.     Plaintiffs and the Class members have fulfilled their obligation under the sales contract for Credit Protection by paying the Credit Protection premiums.

96.     Despite the full performance by Plaintiffs and other Class members, Defendants did not provide Plaintiffs or other Class members with the benefits for which they had paid or did not obtain the necessary permission of Class members before enrolling them in Credit Protection.  Accordingly, to the extent that a contract has been fully formed between Defendants and Plaintiffs and other Class members concerning the purchase of Credit Protection, Defendants have materially breached the contract, which has resulted in harm to Plaintiffs and other Class members, who did not receive the benefit of their bargain.

97.     For those Plaintiffs and other Class members that knowingly purchased Credit Protection, Defendants also breached their obligations to these Plaintiffs and Class members by enrolling them in Credit Protection without adequately disclosing to them the limitations and exclusions for benefits under the plan, and by providing Terms and Conditions that were so unclear and misleading that Class members could not determine the exclusions and limitations of Credit Protection or the value of the product.  Such Plaintiffs and Class members did not receive the benefit of their bargain because they paid for Credit Protection but did not (and could not) get the benefits they were promised.

98.     Defendants also breached their original contract with Plaintiffs and other Class members contained in their Credit Card Agreement by inserting an unconscionable provision in a contract, including, without limitation, the arbitration and class action waiver. This

provision and waiver were contained in the Defendants' original Credit Card Agreement, to which the Credit Protection Plus Addendum is an amendment.

99.     For those Plaintiffs and other Class members who were enrolled in Credit Protection without their affirmative assent, Defendants are in material breach of the original underlying Credit Card Agreements because those agreements did not provide for unauthorized charges and did not permit Defendants to unilaterally impose Credit Protection charges on those who had not authorized such payment, causing damage to such Plaintiffs and Class members.

100.    Alternatively, to the extent Defendants enrolled Plaintiffs and Class members without their consent, such Plaintiffs and Class Members were never proper parties to the Credit Protection agreement itself because they did not voluntarily enroll in Credit Protection, thereby precluding adequate contract formation and entitling those Plaintiffs and Class members to rescission, with a return of all charges.

101.    By reason of the foregoing, Defendants have breached the parties' contract and are liable to Plaintiffs and the other members of the Class for damages or, in the case of those who paid unauthorized charges, for rescission.

## COUNT TWO

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

102.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

103.    In Wisconsin, a covenant of good faith and fair dealing is implied in every contract.  Wisconsin has adopted the concepts of general duties of good faith and fair dealing in the performance of a contract as advanced in the Restatement (Second) of Contracts § 205.

104.     As a direct and proximate result of Defendants' actions as described herein, Plaintiffs and the Class have suffered, and continue to suffer, injury in fact and have lost money as a result of Defendants' breach.

105.     Plaintiffs and other Class members purchased Credit Protection with the expectation that they would receive benefits after a qualifying or "life changing" event, as described in Defendants' advertising, or were enrolled in Credit Protection without their affirmative assent.

106.     Good faith is an element of the contract pertaining to the Credit Protection plan.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

107.     Subterfuge, evasion, concealment, and omission violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain; willful rendering of imperfect performance; abuse of a power to specify terms; and interference with or failure to cooperate in the other party's performance.

108.     Under the Credit Protection Plus Agreement, Defendants impliedly promised to administer these contract obligations in accordance with principles of good faith and fair dealing.

109.     For those Plaintiffs and other Class members that knowingly purchased Credit Protection, they did so with the justifiable expectation that they were eligible to receive the benefits offered by Defendants, that the benefits were the same as those represented to them

though marketing and advertising, and that Defendants had in place a process through which those benefits could fairly and efficiently be administrated.

110.     For those Plaintiffs and other Class members who were enrolled in Credit Protection without their affirmative assent, upon learning that they had been involuntarily enrolled in Credit Protection, they too had the justifiable expectation that they could either cancel Credit Protection and get all of their money back, or were eligible to receive the benefits offered by Defendants, that the benefits were the same as those represented though marketing and advertising, and that Defendants had in place a process through which those benefits could fairly and efficiently be administrated.

111.     As set forth herein, Plaintiffs and other Class members have not obtained the benefit of their bargain from Defendants, or reasonable benefits in light of being involuntarily enrolled, and the essential purpose of the Credit Protection agreement has been frustrated.

112.     By reason of the foregoing, including, but not limited to, enrolling Plaintiffs and Class members in Credit Protection when they were not eligible for most or any of its benefits, or by imposing Credit Protection on them without their consent, or by enrolling them in Credit Protection without adequately disclosing to them the limitations and exclusions for benefits under the plan, and by providing Terms and Conditions that were so unclear and misleading that Class members could not determine the exclusions and limitations of Credit Protection or the value of the product, and thereby going against Plaintiffs' and Class members' justified expectations,  Defendants have breached the covenant of good faith and fair dealing through their policies and practices as alleged herein and are liable to Plaintiffs and the other members of the Class.

113.     Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Credit Protection Plus Addendum Agreement.

114.     Plaintiffs and members of the Class have sustained damages as a result of Defendants' breach of the covenant of good faith and fair dealing.

## COUNT THREE

## UNCONSCIONABILITY

115.   Plaintiffs restate and re-allege the preceding paragraphs of the Complaint as though set out here word for word.

116.   The policies and practices associated with Defendants' Credit Protection plans are substantively and procedurally unconscionable in the following material respects, among others:

a.   Defendants unilaterally imposes Credit Protection upon their customers' credit card accounts, thereby failing to disclose to customers that Credit Protection is an optional plan and that they have the option to "opt out" of Credit Protection;

b.   Defendants did not obtain affirmative consent from subscribers prior to enrolling them in Credit Protection;

c.   Defendants do not provide the terms and conditions of Credit Protection to subscribers until <u>after</u> they have enrolled in the plan;

d.   The written documents that Defendants do eventually provide to subscribers, referred to by Defendants as a Welcome Kit, do not provide subscribers with sufficient information to understand the terms and conditions of Credit Protection;

e.   The Welcome Kit, along with other related documents and written materials in the possession of Defendants, are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendants, which is a party of vastly superior bargaining strength, and only relegate to the subscriber the opportunity to adhere to them or reject the agreement in its entirety;

f.   These documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading, in that they do not require affirmative customer consent (like a signature) and do not unambiguously state that certain customers are ineligible to receive benefits, even though Bank of America had the information and means of determining eligibility prior to enrolling these customers in Credit Protection;

g.   Defendants do not alert customers that certain individuals are ineligible for Credit Protection benefits, including but not limited to retired, unemployed, self-employed, employed by family

members, persons employed on a part-time or seasonal basis and those that are disabled;

h.    The amount charged in fees for Credit Protection is not rationally related to the amount of value Credit Protection provides to subscribers, nor is the value of Credit Protection computable or discernable by subscribers;

i.    Defendants charge exorbitant fees for Credit Protection, much more than the value of the benefits offered or paid out to subscribers, and are able to do so because Defendants do not identify Credit Protection as an insurance product, which would require it to provide fees and claims-paid data to state authorities for review and regulation;

j.    The formula Defendants use to compute Credit Protection fees is misleading such that subscribers are unable to budget for this product or understand its overall cost in order to determine its value to subscribers; and

k.    Defendants operate their customer service centers in such a way as to make it difficult for subscribers to cancel enrollment, obtain information about the terms and conditions of Credit Protection coverage, and file claims, in order for Defendants to maximize the number of Credit Protection subscribers and minimize the amount of benefits they pays to these subscribers.

117.    Considering the great business acumen and experience of Defendants in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

118.    The imposition of such excessive Credit Protection fees that are more than a comparable insurance product would be permitted to charge for premiums is itself unconscionable. Such fees are not reasonably related to Defendants' costs of administering the plan and providing the benefits offered.

119.    Plaintiffs and members of the Class have sustained damages as a result of Defendants' unconscionable policies and practices as alleged herein.

## COUNT FOUR

### FRAUDULENT REPRESENTATIONS AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF § 100.18(1), WIS. STATS.

120.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

121.    Through advertisements and marketing representations, Defendants intended to and did misrepresent to Plaintiffs and the Class, at the time of purchase and at all relevant times, the eligibility, terms, and conditions of their Credit Protection coverage.

122.    Specifically, Defendants' advertisements stated that Plaintiffs and Class members were eligible, would remain eligible, and would receive benefits under Defendants' Credit Protection plan, when these representations were false and misleading.

123.    After and due to seeing and hearing Defendants' advertisements and marketing representations, Plaintiffs reasonably believed, and Plaintiffs and the Class were reasonably likely to believe, that they were eligible, would remain eligible, and would receive benefits under Defendant's Credit Protection plan.

124.    Defendants intended that Plaintiffs and the Class rely upon Defendants' false, deceptive and misleading representations regarding the quality and character of their Credit Protection plan.

125.    Defendants' representations regarding the benefits and exclusions and limitations of their Credit Protection plan were material to Plaintiffs and the Class in deciding to purchase the Credit Protection.

126.    Plaintiffs and the Class would not have purchased Defendants' Credit Protection altogether, or would have paid less for these products, had they known, or had reason to have known, the terms and conditions pertaining to Defendants' Credit Protection coverage.

127.    Defendants' advertisements and marketing concerning their Credit Protection plan and coverage were false, deceptive and/or fraudulent, and induced Plaintiffs and

the other members of the Class to make purchases that they would not have made otherwise if they had been in possession of all of the material facts.

128.     Defendants also deceptively enrolled some Class members in Credit Protection without their affirmative consent and made it difficult for Class members to cancel the Credit Protection or obtain a refund for the premiums they unknowingly paid for a product they did not want.

129.     As a result of Defendants' deceptive conduct and practices, Plaintiffs and the Class suffered pecuniary loss in an amount not less than the purchase price of Defendants' Credit Protection plan, or a portion thereof, plus interest.

## COUNT FIVE

## INTENTIONAL OMISSIONS AND MISREPRESENTATIONS

130.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

131.     Through their advertising and marketing, Defendants intended to and did misrepresent to Class members, and/or intended to and did omit, at the time of sale and purchase and at all relevant times thereafter, the eligibility, enrollment, terms and conditions and administrative process of their Credit Protection coverage.

132.     Specifically, Defendants stated that Class members would be eligible for benefits, would remain eligible for benefits, and would receive benefits, under their Credit Protection plan, when these representations were false and misleading.

133.     Some Class members never agreed to be enrolled in Credit Protection. Failing to inform these individuals that they had been enrolled in a program for which they did not consent was a material omission.

134.     Similarly, failing to adequately disclose to all Class members, especially, but not limited to, those who were not even eligible under the plan or had limitations on their

eligibility, the extensive restrictions and exclusions for benefits and coverage prior to enrolling or selling them the plan was a material omission.

135.    Individuals were justified in believing that their credit card company would not and did not involuntarily enroll them in programs that they did not assent to.

136.    However, if and upon learning that they had been enrolled, these individuals could reasonably believe that they could either cancel Credit Protection and get all of their money back, or were eligible, would remain eligible, and would receive benefits under, Defendants' Credit Protection plan.

137.    For those that knowingly purchased Credit Protection, after and as a result of seeing and hearing Defendants' advertisements and marketing representations, Class members reasonably believed, and Class members were reasonably likely to believe, that they were eligible, would remain eligible, and would receive benefits under, Defendants' Credit Protection plan.

138.    Defendants intended that Plaintiffs and the Class rely upon these false, deceptive, and misleading representations, and/or selected omissions, regarding the quality and character of their Credit Protection plan, including, but not limited to, eligibility and exclusion requirements and limitations.

139.    Defendants' representations and omissions regarding the benefits, exclusions and limitations of their Credit Protection plan were material to the Class members in deciding to purchase the Credit Protection.

140.    Class members would not have purchased Defendants' Credit Protection altogether, or would have demanded to pay less for these products, had they known, or had reason to have known, the limitations and exclusions as written and as applied to the terms and conditions of Defendants' Credit Protection coverage.

141.    Defendants' advertisements and marketing concerning Credit Protection coverage were false, deceptive, and/or fraudulent, and induced members of the Class to pay

money that they would not have otherwise paid if they had been in possession of all of the material facts.

142.     As a result of Defendants' deceptive conduct and practices, Plaintiffs and the Class suffered pecuniary loss in an amount not less than the purchase price of Defendants' Credit Protection plan, or a portion thereof, plus interest.

## COUNT SIX

### INJUNCTIVE RELIEF
### CREDIT PROTECTION RESTITUTION

143.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

144.     Plaintiffs ask the Court to grant the remedy of restitution to themselves and to all members of the Class who made payments to Defendants for Credit Protection.  The Plaintiffs ask the Court to grant the following relief:

a.     a refund of all Credit Protection payments made to Defendants;

b.     a refund to any consumers who were ineligible for benefits, or who faced additional restrictions to receive benefits as a result of their health or employment status, at the time they were sold Credit Protection by Defendants or at any time they paid for Credit Protection; and/or

c.     a refund to consumers who were otherwise not eligible for Credit Protection benefits at any time they paid for Credit Protection; and/or

145.     Further, Plaintiffs seek injunctive relief enjoining Defendants from continuing to engage in the fraudulent, deceitful, unlawful, and unfair common scheme described in this Complaint.

## COUNT SEVEN

## DECLARATORY RELIEF

146.    Plaintiffs restate and re-allege the preceding paragraphs of this Complaint as though set out here word for word.

147.    Plaintiffs seek a Declaratory Judgment finding that the conduct of Defendants is in violation of § 100.18(1), Wis. Stats., and enjoining it from continuing in such conduct.

## COUNT EIGHT

## UNJUST ENRICHMENT

148.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

149.    In seeking to sell Credit Protection to Plaintiffs and members of the putative Class, Defendants withheld material terms from consumers prior to activation of Credit Protection charges, including the express benefits, limitations, restrictions, and exclusions associated with the product.

150.    Defendants were unjustly enriched by the practice of signing people up for Credit Protection that never agreed to be plan members.

151.    Defendants were unjustly enriched by the practice of withholding material terms of Credit Protection until after the product was charged to consumers' credit cards.

152.    Defendants were unjustly enriched by their business practice of making it so impermissibly difficult for consumers to actually receive coverage under Credit Protection that the service was virtually worthless.  Upon information and belief, such unconscionable acts include, but are not limited to:

a.      Denying claims over the phone without written explanation;

b.      Denying claims due to exclusions that were not disclosed to subscribers before enrolling in the plan;

c.      Denying claims without sufficient investigation;

d.      Requiring claimants to submit excessive and duplicate documentation;

e.      Refusing to credit or reverse charges for Class members who did not voluntarily enroll in the plan; and/or

f.      Establishing a telephone number that does not allow for claimants to speak to a live person, a person in a timely manner, or a person that is properly trained to handle Credit Protection claims, in order for the subscriber to successfully file a claim

153.    Defendants were unjustly enriched by charging Plaintiffs and the Class members for Credit Protection even though Plaintiffs and the Class members were not eligible to receive payments by the terms of the Credit Protection plan due to certain exclusions.

154.    Overall, Defendants were unjustly enriched by charging Plaintiffs and the Class members for an effectively worthless product with illusory benefits; while marketed as a benefit to consumers, Credit Protection was really a benefit to Defendants – who gathered fees for the illusory service, and even charged Finance Charges during periods of "benefits", at consumers' expense.

155.    As a result of Defendants' actions that constitute unjust enrichment, Plaintiff is entitled to restitution and/or disgorgement.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray:

A.      That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure. The Plaintiffs are proper class representatives and the best practicable notice of this action is to be provided to members of the Class represented by the Plaintiffs;

B.      That judgment be entered against Defendants and in favor of Plaintiffs and the Class on the Causes of Action in this Complaint, for injunctive and equitable relief as requested

above, and for actual, compensatory, punitive, and treble damages in an amount to be determined at trial;

C.      That Declaratory Judgment be entered against Defendants finding that the conduct of Defendants is in violation of § 100.18(1), Wis. Stats., and enjoining Defendants from continuing in such conduct.

D.      That judgment be entered imposing interest on damages, litigation costs, and attorneys' fees against Defendants;

E.      For all other and further relief as this Court may deem necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury consisting of twelve persons on all issues so triable.

DATED:  March 18, 2011                    ADEMI & O'REILLY LLP


By:  /S/ COREY MATHER
Guri Ademi (SBN: 1021729)
Shpetim Ademi (SBN: 1026973)
David J. Syrios (SBN: 1045779)
Corey Mather (SBN: 1046210)
3620 East Layton Ave.
Cudahy, Wisconsin 53110
Telephone:      (866) 264-3995
Facsimile:      (414) 482-8001
gademi@ademilaw.com
sademi@ademilaw.com
dsyrios@ademilaw.com
cmather@ademilaw.com

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Wendy R. Fleishman
Rachel Geman
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:      (212) 355-9500
Facsimile:      (212) 355-9592
wfleishman@lchb.com
rgeman@lchb.com

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol
Allison Elgart
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:     (415) 956-1000
Facsimile:     (415) 956-1008
msobol@lchb.com
aelgart@lchb.com

**GOLOMB & HONIK, P.C.**
Ruben Honik
Richard M. Golomb
Kenneth J. Grunfeld
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Telephone: (215) 985-9177

**CARNEY WILLIAMS BATES BOZEMAN & PULLIAM, PLLC**
Allen Carney
Marcus Bozeman
Randall K. Pulliam
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Tel: (501) 312-8500
Fax: (501) 312-8505

*Counsel for Plaintiffs and Proposed Class*