# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED PSL

10 DEC -6 AM 9: 12

BY_____DEPUTY
HENN CO. DISTRICT
COURT ADMINISTRATOR

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil
(Consumer Protection)

State of Minnesota by its Attorney General,
Lori Swanson,

        Plaintiff,

   vs.

Discover Financial Services, Discover Bank,
and DFS Services, LLC;
        Defendants.

Court File No. _____

**COMPLAINT**

The State of Minnesota, by its Attorney General Lori Swanson, for its Complaint against Defendants Discover Financial Services, Discover Bank, and DFS Services, LLC (jointly "Discover"), alleges as follows:

## INTRODUCTION

1.      One out of four households in America has a credit card issued by Discover, one of the nation's largest credit card issuers.  Discover earns nearly $300 million in annual revenue from the sale of several optional fee-based financial products, an increase of over $80 million, or more than 37 percent, from just two years ago.  Discover markets these add-on products as ways for consumers to protect themselves from fraudulent or unauthorized charges or to enhance their financial security against such hazards or hardships like job loss or sickness, identity theft, lost wallets, or low credit scores.  Yet, Discover often enrolls consumers in these products based on highly deceptive and misleading telemarketing calls, charging some consumers without their meaningful consent or understanding that their credit

911832.1

card will be charged for these products.  Discover is in a position to do this because, unlike a typical telemarketer, it is the consumer's credit card company and already has their credit card number.  The State of Minnesota by its Attorney General, Lori Swanson, brings this consumer protection lawsuit against Discover to address its deceptive business practices.

## PARTIES

2.      Lori Swanson, the Attorney General of the State of Minnesota, is authorized under Minn. Stat. Ch. 8, including Minn. Stat. §§ 8.01, 8.31, and 8.32, and under § 325F.70 (2008), and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens to enforce Minnesota law.

3.      Discover Financial Services is incorporated in Delaware and its principal place of business is at 2500 Lake Cook Rd., Riverwoods, Illinois 60015.  Discover Financial Services is organized as a bank holding company and financial holding company.  Discover Financial Services wholly-owns Discover Bank and DFS Services LLC.  Discover Financial Services' 2009 Annual Report indicates that it is involved in the marketing and sale of the fee products discussed in this Complaint.

4.      Discover Bank is a Delaware state-chartered bank and a leading credit card issuer.  Discover Bank's principal place of business is at 502 E. Market St., Greenwood, DE 19950.

5.      DFS Services, LLC is Discover Bank's service affiliate and, as such, provides various services for Discover Bank such as marketing, application approval, transaction approval, customer service, security, billing and the collection of delinquent accounts.  DFS Services, LLC's principal place of business is at 2500 Lake Cook Rd., Riverwoods, Illinois 60015.

911832.1

2

6.     Discover Bank, DFS Services, LLC, and Discover Financial Services are referred to jointly as "Defendants" or "Discover."  Discover is one of the largest credit card issuers in the United States.  Discover's 2009 Annual Report boasts that 1 in every 4 American households has a Discover credit card.  There are reportedly 54.4 million Discover credit cards in circulation in the United States.

## JURISDICTION

7.     This Court has jurisdiction over the subject matter of this action pursuant to Minn. Stat. §§ 484.01, 8.01, 8.31, 8.32, subd. 2(a), and 325F.70 (2008).

8.     This Court has personal jurisdiction over Discover Financial Services, Discover Bank, and DFS Services, LLC because they do business in Minnesota and have committed acts in Minnesota causing injury to Minnesota consumers.

## VENUE

9.     Venue in Hennepin County is proper under Minn. Stat. § 542.09 (2008) because the cause of action arose, in part, in Hennepin County.

## FACTUAL BACKGROUND

**I.     Discover Markets to Its Cardholders Optional Fee-Based Products, Such as Its "Payment Protection Plan," Which Generate Substantial Revenue for Discover.**

10.     Discover sells at least four optional financial products for a monthly fee. Discover touts all four optional fee-based plans as ways for consumers to protect themselves from fraud or unauthorized charges or to increase their financial security.  These products are currently called the "Payment Protection Plan," "Identity Theft Protection," "Wallet Protection," and "Credit Score Tracker" (the "Plans").  Discover charges $0.89 for every $100 of outstanding balance on the cardholder's account each month for Payment Protection;

3

$12.99 a month for Identity Theft Protection; $2.99 a month for Wallet Protection; and $7.99 a month for Credit Score Tracker. Annualized, a consumer with a $5,000 credit card balance each month would be charged $534 for the Payment Protection Plan. Identity Theft Protection costs almost $160 per year. Cardholders who are enrolled in these plans do not receive a separate invoice for these monthly fees. Instead, Discover charges the fee directly to the consumer's Discover credit card each month.

11.     During a recent two-year period, Discover enrolled tens of thousands of Minnesotans and charged them millions of dollars for enrollment in the Plans.

12.     In its 2009 Annual Report, Discover reports income of over $295 million in 2009 for enrollment of its customers in optional fee-based products, up $45.3 million, or 18 percent, from 2008. Similarly, Discover reports that its 2008 income from the sale of optional fee based products -- $249 million -- was up $35.2 million, or 16 percent, from 2007. Discover says its increased income from the sale of optional fee based products is "primarily related to an increase in the number of customers that purchased the products and services," as well as higher account balances on which some of the fees are based.

13.     The Payment Protection Plan purports to temporarily suspend the cardholder's obligation to make regular monthly payments on their Discover card in the event of certain qualifying events. The qualifying events include involuntary unemployment, disability, hospitalization or natural disasters. If a cardholder maintains an outstanding balance on their credit card, experiences a qualifying event and otherwise meets the requirements of the plan's terms and conditions, they may qualify for a temporary suspension of their monthly payment obligations.

14.     The Payment Protection Plan is similar to credit insurance in the sense that it purports to protect the borrower from defaulting if an unanticipated event disrupts the borrower's source of income.   But unlike credit insurance, Payment Protection does not actually make monthly payments as they come due each month.   Instead, Payment Protection only suspends the borrower's obligation to make monthly payments temporarily.

15.     Unlike credit insurance, Payment Protection plans are generally not regulated by state insurance regulators.   With credit insurance, state insurance regulators at least set basic minimum terms and conditions, and also are required to regulate premiums to insure that costs are reasonable in relation to the benefits of the product.   By contrast, payment protection plans are generally unregulated as to terms, conditions, and fees, making the plans highly profitable for Discover.

16.     These types of plans have been subject to criticism from consumer advocates on several fronts.   For example, it may not be disclosed to consumers that under the terms and conditions of the plan, the cardholder may not be permitted to use their credit card while they have invoked the debt suspension benefits, even though the qualifying events that trigger the debt suspension benefit -- such as unemployment -- may be when the cardholder needs their credit card the most.   Under Discover's Payment Protection Plan, a cardholder cannot use the card when monthly payments are suspended due to a hardship.

17.     Critics also point out that debt suspension agreements are sometimes marketed to elderly consumers, for whom the benefits may be of little or no value.   The main benefit of such plans is that they suspend payment obligations when the borrower's income stream is lost due to unemployment, disability or natural disaster.   But for those on a fixed income, any

such "protection" may be illusory because the "qualifying events" will not disrupt the income stream coming from a fixed income.

18.     While Discover enrolls many more Minnesotans in its Payment Protection Plan than the other plans, Discover also deceptively enrolls Minnesotans in the Credit Score Tracker, Identity Theft Protection and Wallet Protection plans.  With Discover's Credit Score Tracker, the cardholder is given a copy of their Experian credit report.  (Experian is one of the three major credit reporting agencies.)  In addition, enrollees are given access to tools that allow them to track their credit score on a daily basis and to receive e-mail alerts if there are changes to their credit score.  A main selling point Discover uses to market this plan is the Experian credit report consumers receive.  Discover charges enrollees an additional $19.99 (in addition to the monthly fee) if they want credit reports from the other major credit reporting agencies.  Experian and the two other major credit reporting agencies, however, are required by federal law to provide consumers one free credit report each year.  Discover's Identity Theft Protection plan purports to monitor the enrollee's credit score for indicia of identity theft and will alert the enrollee if something suspicious happens to their credit score.  Under Discover's Wallet Protection plan, if the enrollee's wallet is lost or stolen, Discover will contact the issuers of the enrollee's credit cards to cancel the card.

## II.     Discover Enrolls Cardholders in the Plans Without Their Meaningful, Knowing Authorization.

### A.     Discover's Telemarketers Routinely Take Advantage of Cardholders.

19.     As noted above, Discover's optional fee based plans are a major revenue stream for Discover.  Discover aggressively and deceptively markets the plans to consumers.

20.    Discover enrolls far more cardholders through telemarketing than through the mail or online, the latter two of which require an affirmative act by the consumer to enroll, such as initialing their monthly statement in the designated place, authorizing enrollment, and mailing it back to Discover.

21.    Most of Discover's cardholders are enrolled in the plans through Discover's aggressive and deceptive telemarketing efforts and card activation calls.  Some of these calls are made internally by Discover, and others are made by telemarketing firms that Discover hires.

22.    In addition to Discover's financial motive to enroll as many Minnesotans as possible into its highly lucrative fee-based products, individual Discover telemarketers are incentivized to enroll as many cardholders as possible, either because their compensation is commission-based or because their performance is otherwise compensated on the number of cardholders they enroll.

i.    **Discover's Telemarketers Lull Cardholders into Believing They Are Not Receiving a Sales Call.**

23.    The deception in the telemarketing calls starts from the very beginning of the call.  Discover's telemarketing scripts attempt to lull the cardholder into believing they are receiving a courtesy call from Discover rather than a sales call.  For example, Discover's "Master Script" for Wallet Protection instructs the telemarketer, after introducing themselves as "(First Name) with Discover Card," to state:

> I would like to thank you for being a valued Cardmember with us since _____.
> I wanted to remind you that you have earned approximately _____ in Cashback Bonus on your Discover Card.  Don't forget you can redeem your rewards for…

The script goes on to list various ways that Cashback bonus points may be redeemed, and then requires the telemarketer to ask the cardholder if they have questions regarding their Cashback bonus.  Similarly, Discover telemarketers are instructed to tell family members who answer the phone that it is just a "courtesy call."  Neither customer loyalty nor the Cashback plan, however, have anything to do with why the telemarketer is really calling, which is to sell a fee-product.

      ii.    **Discover's Telemarketers Deceive Some Cardholders into Giving an Affirmative Response, Regardless of Whether or Not the Cardholder Understands They are Authorizing Enrollment.**

24.    The purpose of Discover's telemarketing calls is to enroll the cardholder in one of its fee-based plans.  Its telemarketing scripts, however, continue to hide the ball.  Having lulled the cardholder into believing the call is in regard to some benefit the cardholder could enjoy under the Cashback plan, the script continues as if it is describing another feature of the Discover card that the cardholder enjoys.  For instance, the script for the Wallet Protection Plan says:

> In addition to your rewards, we also have a valuable service that many of our Cardmembers are taking advantage of called Wallet Protection.  In the event your wallet is ever lost or stolen, you make just one call and we will contact all your card issuers to cancel your cards and request replacements for you.  In addition we will monitor your credit for 90 days and alert you of key changes that could indicate potential fraud.  As an added bonus, we will wire you up to $1,000 in Emergency Cash....

25.    After giving the impression that Wallet Protection is a regular feature of the card just like the Cashback plan, the telemarketer then is supposed to read a "disclosure" to the cardholder.  If the telemarketer can elicit some affirmative response from the cardholder, such as "ok" or "yes" after the "disclosure," the telemarketer treats the affirmative response as the cardholder's agreement to enroll in the plan, regardless of whether the consumer

understands that they are supposedly agreeing to purchase a product and that their credit card will be charged.

26.    Discover's telemarketers employ an array of deceptive tactics to elicit an affirmative response from the cardholder without the cardholder actually understanding that they are supposedly agreeing to purchase an optional product for a monthly fee, thereby tricking some consumers into unknowingly signing up for the plans.  One common tactic is for the telemarketer to butcher or alter the text of the "disclosure" in an effort to make the "disclosure" sound like incomprehensible legalese and to hide the fact that a sale is supposedly taking place.  In a traditional telemarketing call, the consumer must read their credit card number to the telemarketer in order to purchase a product.  Here the telemarketer *is* the credit card company.  As a result, Discover can post charges on a consumers' account even when there has been no clear and knowing consent given by the consumer.

27.    Some of Discover's telemarketers read the script so quickly that cardholders cannot understand the text or do not understand they are allegedly being sold a product.  The telemarketer then says to the cardholder "Ok, Ms. Smith?" as if the telemarketer is wrapping up the call.  Some cardholders reflexively respond "Ok," not to indicate their consent to purchase a product but to end the phone call, which they still believe is a courtesy call regarding the benefits of the Discover card.  Discover later relies on this "affirmative response" as "proof" that the cardholder knowingly agreed to purchase the plan.

28.    Another common tactic is for the telemarketer to use intonation and timing to distort the disclosure.  Some telemarketers, while speed-reading the disclosure in a monotone, intentionally run sentences together without pausing for periods, and then pause where there is no period.  Another tactic is to speed-read, slur, or skip altogether the substantive terms

such as the word "enrollment" or price terms but then slow down and emphasize the portions of the script that do not suggest a sale is supposedly taking place, such as the customer service phone number for questions about the plan.  These tactics are designed to further the impression that the cardholder is receiving a courtesy call from Discover simply to describe some of the benefits of being a Discover cardholder.

29.     Some telemarketers take advantage of this confusion by acting as if they regret having to read legal mumbo-jumbo to the cardholder, but that it is required for some unknown legal reason.  This tactic has the same goal as the other deceptive tactics -- to obscure the fact that a sale is being attempted by the telemarketer.

30.     There are many ways Discover's telemarketers read the scripts misleadingly. In some instances, the telemarketer successfully reads the "disclosure" in such a manner that the cardholder has no idea what the text meant.  These cardholders may say "Ok" or "yes" at the conclusion of the call, but no reasonable person listening to the recordings of these calls would conclude the cardholder was giving their knowing, meaningful assent to be charged a monthly fee for enrollment in the plan.

      **iii.    Discover's Telemarketers Sometimes Enroll Cardholders Who Do Not Give an Affirmative Response.**

31.     In addition to deceptively inducing cardholders to say "yes" or "ok" during the call, Discover enrolls some cardholders who did not give an affirmative response.  On some of the recordings (which Discover refers to as "proof of enrollment" or "POE"), the recording does not include an affirmative response from the cardholder.  Instead, the recording ends without any affirmative indication from the cardholder.  Moreover, as discussed further below, in some instances Discover simply has no recording at all for enrolled cardholders.

### iv.   Discover's Telemarketers Enroll Some Cardholders Who Plainly Do Not Agree to be Charged for the Plan.

32.     Sometimes the telemarketer's deceptive tactics fail and the cardholder tells the telemarketer he or she is not interested.  Undeterred, Discover's telemarketers sometimes assure these cardholders that Discover is simply going to send the cardholder a "packet of information" about the plan.  When these skeptical cardholders state that it is "ok" for Discover to send them information to look over about the plan, the telemarketer treats this affirmative response as the cardholder's authorization for paid enrollment, even though the consumers do not believe they have agreed to purchase anything.

33.     When cardholders later contact Discover to complain that they have been enrolled without their authorization, Discover purports to review the partial recordings of their conversations with the telemarketers.  Discover sometimes concludes that the cardholder gave their authorization, even when the cardholder never actually states that he or she agrees to be enrolled in the paid plan.  Discover routinely refuses to reimburse cardholders the amounts that have been billed to their Discover card for the plan, even when cardholders are adamant that they only gave approval to have information about the plan sent to them, not for enrollment.

34.     There is a packet of information for each of the plans that Discover sends to some cardholders after Discover enrolls them in the plan.  Discover's internal audits, however, have revealed that that the number of enrollees in the plans is not consistent with the number of packets sent to cardholders.

35.     Cardholders who receive the packet sometimes disregard it because many cardholders do not know Discover has enrolled them.  They may assume that the packet is just

another piece of junk mail from a credit card company.  Those cardholders that told the telemarketer they could send information about the plan may recognize what the packet relates to, but assume they must take further steps before they are enrolled in the plan.  If the cardholder is not interested in the plan but simply agreed to receive information about the plan to end the call with the telemarketer, they may simply throw out the packet.

36.   In short, Minnesota consumers are routinely enrolled in Discover's plans without their knowing authorization through the use of deceptive telemarketing calls.

**B.    Discover Deceptively Enrolls Minnesota Consumers During the Card Activation Process.**

37.   In addition to its deceptive outbound telemarketing practices, Discover enrolls some Minnesota cardholders in the plans without their knowledge during the card activation process.  When a new Discover cardholder receives their credit card in the mail, the card has not been activated.  Instead, the cardholder must call Discover from their home phone number to activate their card.  Discover may also issue new cards to existing cardholders which the cardholder must call to activate.

38.   Discover routinely transfers these new card holders to a live operator.  At some point during these activation calls, the Discover representative turns on a recording device and says to the consumer "I need to record your enrollment."  The representative then reads to the cardholder one of the "disclosures" like those discussed above.  Some Minnesota cardholders that have been enrolled in one of these plans through this process have no idea that they are enrolled in one of Discover's plans.

39.   Cardholders who are calling to activate a credit card are particularly susceptible to believing that the "disclosure" is some legal text that must be read to the

cardholder, rather than an alleged contractual agreement to purchase an optional paid product. Given all the disclosures and fine print that consumers receive when they open a new credit card account, reading the disclosure to cardholders in the card activation context can mislead cardholders about the purpose of the disclosure. Accordingly, many Minnesota cardholders who receive the disclosure during the card activation process and reply "ok" have no idea that they have supposedly purchased some optional product.

III.     **Discover Refuses to Refund Some Minnesota Consumers Who Were Unfairly Enrolled in Its Plans Without their Understanding.**

     A.     **Minnesotans Call to Cancel in High Numbers, Further Demonstrating Fraudulent Enrollment.**

40.     The deceit in the enrollment process for Discover's optional paid products is so widespread that Discover has developed a series of standard procedures to process the high volume of complaints. Discover's policy is that any cardholder who calls and complains that they were enrolled without their authorization within 30 days of being enrolled gets their money back -- no questions asked, no recording reviewed, no apparent effort made to determine how the cardholder was enrolled without their authorization.

41.     Discover's policy is very different with respect to cardholders who contact Discover and complain that they were enrolled without their authorization more than 30 days after being enrolled. Discover will cancel these cardholders' enrollment going forward but often will not refund the cardholder for amounts they have already paid for enrollment. Many cardholders simply cancel their enrollment at this point, but give up on seeking reimbursement for amounts they have already been charged.

42.     Some cardholders, however, are unhappy with Discover's refusal to reimburse them for the unauthorized charges and insist that Discover provide a full refund for all the

past charges.  For these cardholders, Discover purports to open an "investigation" into the cardholder's allegation of unauthorized enrollment.  As set forth in greater detail below, Discover's investigations routinely find that the cardholder authorized their enrollment, even when Discover does not have a partial recording of a telemarketing call with a cardholder or when the recording does not demonstrate the consumer's knowing consent for their credit card to be charged.

**B.      Discover Routinely Refuses to Refund Minnesota Consumers Who Do Not Call to Cancel Within Thirty Days of Being Charged, Often Making Additional Misrepresentations Regarding Consumers' Purported Authorized Enrollment.**

43.      Many cardholders have no idea they are enrolled in a plan and do not notice or appreciate the meaning of the line-item charge for the plan that Discover bills to their Discover account each month.  Some cardholders pay this inconspicuous charge month after month for many months before they become aware of the purpose of the charge.

44.      There are many reasons why a cardholder may not understand that Discover enrolled them in one of the plans even though the charge appears on their credit card statement.  For one, the charge appears among the other purchases on the cardholder's monthly statements.  Many cardholders rely on the integrity of Discover's monthly statements as setting forth legitimate charges the cardholder authorized.

45.      Other cardholders may not make new purchases with their Discover card but instead are just paying down an existing balance, such as cardholders who took advantage of a balance transfer offer or who are financing one big expense on the account.  Many such cardholders pay only the minimum amount due each month, or some other pre-determined amount, and do not review their statements for new unauthorized charges.  For these and other

911832.1                                                14

reasons, some cardholders are billed month after month without knowing that Discover has enrolled them in one of its plans.

46.     This is also true for cardholders who make their monthly payments online. For example, charges for Payment Protection are posted to a cardholder's account on the last day of each statement period, and that statement is then archived on the website. If a cardholder goes to Discover's website to review activity on their account, the website only displays activity for the current billing period. Accordingly, a cardholder could review the activity on their Discover card account online several times a week, and could be charged month after month for enrollment in Payment Protection without ever noticing the charge.

47.     In addition to the obvious unfairness of enrolling cardholders without their valid authorization, Discover reaps an extra windfall because these enrollees will never invoke the supposed benefits of the plans for which they were charged.

      i.    **Discover Routinely Tells Cardholders They Authorized Their Enrollment, Even Though Discover Knows There are Widespread Problems With Misleading Enrollments of Consumers.**

48.     Notwithstanding indications of widespread problems and deception in the enrollment process, Discover often deceptively tells complaining cardholders that they must have given their authorization or they would not have been enrolled.

      ii.    **Discover Routinely Claims That its Partial Recordings of Telemarketing Calls Demonstrate Authorization When They Do Not.**

49.     When Discover opens an "investigation" into a cardholder's allegation of unauthorized enrollment, sometimes Discover will search its records to see if it possesses a partial recording of a telemarketing call for that cardholder. But Discover also routinely resolves disputes regarding whether the cardholder gave their authorization for enrollment on

factors other than the existence or quality of the recording. Instead, Discover often resolves such disputes in its own favor based on factors such as the length of time the cardholder has been enrolled, regardless of any recording.

50.     In other cases, Discover does review the partial recording of the telemarketing call as part of its "investigation." In some cases, Discover partially or fully reimburses cardholders after reviewing the recording and determining that their enrollment was not valid. In other cases, Discover often concludes that its cardholder gave their authorization even when the recording demonstrates the deceptive "gotcha" tactics of the telemarketers, described above.

> **iii.     Discover Tells Cardholders They Authorized Enrollment Even When Discover Does Not Have a Recording of a Telemarketing Call for that Cardholder.**

51.     For some enrolled cardholders, Discover was unable to produce any recording at all of the cardholder's supposed authorization in response to the Minnesota Attorney General's Civil Investigative Demand. The Civil Investigative Demand requested all the recordings for Minnesota cardholders enrolled on a number of specific days. It also asked for a list of Minnesotans enrolled in the plans, indicating the day on which they were enrolled. For 14% of the cardholders enrolled on the specific days requested, Discover did not produce any recordings or other evidence of authorization.

52.     The Civil Investigative Demand also requested recordings for all Minnesota cardholders who disputed their enrollment over a two-year period. Discover did not produce recordings for 38% of those cardholders. When Discover opens an investigation into a cardholder's allegation of unauthorized enrollment, it often cannot find any recording of the

telemarketing call showing the cardholder supposedly gave their consent. While Discover sometimes reimburses the cardholder in this circumstance, often times it does not.

53.     Disputes about enrollment in Discover's Plans are so common that Discover has a number of template form letters to fill-in and send to consumers who complain. In some cases when Discover has no recording, it has nevertheless sent letters to cardholders stating that Discover has reviewed the recording of the cardholder giving their authorization for enrollment. In other cases where Discover cannot find the recording, Discover sends a letter to the cardholder stating that since the cardholder paid the fees, the enrollment is valid. These latter letters do not disclose that Discover does not have any recording of the cardholder's enrollment.

> iv.     **Discover Conceals Recordings that Demonstrate the Telemarketer's Deceptive Tactics.**

54.     As set forth above, some of Discover's partially recorded telemarketing calls demonstrate Discover's deceptive enrollment tactics. Presumably for this reason, in some cases, Discover refuses to provide cardholders with a copy of the recording as to play the recording for them. Instead, Discover tells cardholders that the recording is "proprietary," even though there is no legitimate business interest that is protected by hiding the recording of a cardholder's alleged authorization from the cardholder who is on the recording. Discover takes the "Catch 22" position with these cardholders that: 1) we have a recording that demonstrates your authorization; but 2) we refuse to let you hear it. Discover's policy of refusing to provide a copy of these recordings further conceals Discover's wrongdoing.

IV.    **Examples of Minnesotans Who Were Unaware Their Credit Card Would be Charged for Optional Discover Fee Products.**

55.    The following non-exclusive stories are examples of consumers who are enrolled in Discover's products without their meaningful consent:

a.    **D.E.**

D.E., who is 55 years old, lives in rural Minnesota, and is employed by the United States Postal Service, received a telemarketing call from Discover.  At the time, D.E. was financing two large expenses on his Discover card, but did not use the card for day-to-day purchases.  Accordingly, he paid the monthly amount due online each month but did not check for new purchases on the account because he knew he was not making new purchases.  Many months later, while reviewing one of his statements, he found that he was being charged for something called the Payment Protection Plan.  In total, D.E. was charged over $900 for enrollment in the Payment Protection Plan.  The recording of D.E.'s telemarketing call, produced by Discover during the State's investigation, reveals that D.E. never gave his authorization for enrollment in the product but was simply read an incomprehensible and meaningless "disclosure" by the telemarketer, after which, the telemarketer hung-up.  D.E. was not reimbursed by Discover.

b.    **B.S.**

B.S. resides in Cottage Grove, Minnesota and is an executive with a Minnesota company.  B.S. has been a Discover cardholder since 2009.  In October 2009, a telemarketer called B.S. and told him that Discover wanted to mail B.S. some materials regarding the company's Payment Protection plan for B.S. to review.  B.S. was not interested in the plan but let the telemarketer continue with the sales call.  The telemarketer claimed that he had to read

a disclosure detailing the plan's benefits and spoke so fast that B.S. was not sure of everything being said.  When the telemarketer finished his speed-reading and asked if everything was okay, B.S. asked the telemarketer to ensure that he was not being enrolled in the plan.  The telemarketer then misled B.S. into believing that he was not automatically enrolled in the plan—that Discover simply wanted to send out some information for B.S. to review to make his final decision.  B.S. later noticed an unauthorized charge on his monthly Discover statement and called Discover about the charge.  B.S. was surprised to find out that he was in fact enrolled in the Payment Protection Plan.

     c.     **D.O.**

D.O. is a retired Transit Operator for the Duluth Transit Authority.  He noticed a charge of $40.45 for "Payment Protection."  D.O. called Discover because he did not know what this charge was for and thought it might be a fraudulent charge.  Discover's customer service representative told him that the charge was for enrollment in the Payment Protection Plan and that he had been charged for this plan in previous months.  The representative explained to him that Payment Protection is a plan offered by Discover where if he lost his job or became disabled, he would not have to make monthly payments on his Discover card. D.O. explained to the representative that he is retired and therefore would not have any use for this plan.  The representative told him he could cancel his enrollment but that since D.O. had authorized enrollment in the Plan, he could not refund any of charges.  D.O. filed a complaint with the Minnesota Attorney General's Office.  After the Attorney General's Office mediated D.O.'s dispute with Discover, Discover agreed to reimburse D.O. for the charges but never disclosed to D.O. that they did not have a recording of his authorization for enrollment.  The Minnesota Attorney General's Office later sent a letter to Discover

demanding to receive a copy of D.O.'s alleged recording and further asked for the recording as a part of its investigation, but, to date, Discover has failed to produce any recording for D.O.  D.O. has since closed his Discover account because he does not trust their business practices.

### d.   K.R.

K.R. is an attorney in St. Paul and a Discover credit card holder.  K.R. received a telemarketing call from a Discover representative.  The salesperson attempted to sell K.R. the Payment Protection Plan.   Approximately one week later, K.R. received a letter from Discover congratulating her on her enrollment in Payment Protection.  She was also charged $38.13 on her next Discover card statement for the product.  K.R. wrote a letter to Discover, copied the Minnesota Attorney General's Office, stating there was fraud occurring in the way cardholders were being enrolled in the Payment Protection Plan.  Discover wrote K.R. back, copying the Minnesota Attorney General's Office, stating that Discover had "personally audited the taped telephone conversation between you and the telemarketing representative" and had "confirmed your enrollment in the service was valid."  In fact, the only recording that Discover has produced to the State that supposedly shows K.R.'s authorization does not demonstrate K.R.'s consent to be enrolled.  Not only is the reading of the script by the telemarketer completely incomprehensible, there is no affirmative response of any kind by K.R. demonstrating authorization for enrollment.  While Discover eventually agreed to refund K.R. the $38.13 charge, it maintained until the end that her recording constituted valid authorization.

e.   **P.B.**

P.B. resides in St. Cloud, Minnesota and is 59 years old.  P.B. currently works at a Veterans Administration Medical Center.  In May 2009, P.B. called Discover to activate her credit card.  After activating the card, the Discover representative P.B. spoke with tried selling P.B. on the company's Wallet Protection plan.  P.B. was not interested in the plan and clearly remembers telling the telemarketer, "No, I don't want that."  The telemarketer said "okay," but then asked P.B. if Discover could send her something in the mail regarding the Wallet Protection plan.  The telemarketer lead P.B. to believe that Discover was simply going to send her a packet of information about the plan so that P.B. could make an informed decision on whether or not to enroll in the plan.  P.B. told the Discover representative that he could send the packet of information, but she never gave her authorization to enroll in the plan.  P.B. later learned that Discover enrolled her in the Wallet Protection plan during the phone call and without her authorization.  Discover has not reimbursed P.B. for the charges for Wallet Protection.

f.   **J.A.**

J.A. is a Discover cardholder and resides in Minneapolis, Minnesota with her husband and children.  Discover calls J.A. often with telephone solicitations for its fee products.  J.A. received one such telemarketing call from Discover offering the Payment Protection plan. J.A. was not interested in the plan and told the telemarketer that she wanted to verify that she was not being enrolled.  Instead, she wanted to confirm that she would have to fill out paperwork or take additional actions to enroll in the plan.  The telemarketer led J.A. to believe that Discover was simply going to send her a packet of information to review, and told J.A. that she could make her "final decision" after reviewing the material "in the privacy of [her]

own home." Sometime after the phone call, J.A. noticed a monthly fee of about $30 being charged to her Discover card for the Payment Protection plan. J.A. was quite surprised, as she had explicitly asked for assurance that she was not being automatically enrolled in the plan during the phone call. If J.A. had known the telemarketer was completing her enrollment, she would have said "No thank you."

## COUNT I
## PREVENTION OF CONSUMER FRAUD ACT

55.     Plaintiff re-alleges all prior paragraphs of this Complaint.

56.     Minn. Stat. § 325F.69, subdivision 1 (2008) provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

57.     The term "merchandise" within the meaning of Minn. Stat. § 325F.69 includes services. *See* Minn. Stat. § 325F.68, subd. 2 (2008).

58.     Defendants' conduct described above constitutes multiple, separate violations of Minn. Stat. § 325F.69, subd. 1. Defendants have engaged in deceptive and fraudulent practices, and have made false and misleading statements, with the intent that other rely thereon in connection with the sale of Defendants' services. By failing to disclose and omitting material facts, Defendants have further engaged in deceptive and fraudulent practices in violation of the Consumer Fraud Act.

## COUNT II
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

59.     Plaintiff re-alleges all prior paragraphs of this Complaint.

60.     Minn. Stat. § 325D.44, subdivision 1 (2008) provides, in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

>   (5)     represents that goods or services have…characteristics…[or] benefits…that they do not have…;

>   (7)     represents that goods or services are of a particular standard, quality, or grade…if they are of another;

>   (9)     advertises goods or services with intent not to sell them as advertised;

>   (11)    makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

>   (13)    engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

61.     Defendants' conduct described above constitutes multiple, separate violations of Minn. Stat. § 325D.44, subd. 1.  Defendants have engaged in deceptive practices by representing that services have characteristics and benefits that they do not have; representing that services are of a particular standard, quality, or grade when they are of another; advertising services with intent not to sell them as advertised; making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.  By failing to disclose and omitting material facts, Defendants have further engaged in deceptive and fraudulent practices in violation of the Uniform Deceptive Trade Practices Act.

## COUNT III
## UNJUST ENRICHMENT

59.     Plaintiff re-alleges all prior paragraphs of this Complaint.

60.     By unknowingly paying unauthorized or otherwise fraudulent charges to Discover, as stated above, Minnesota cardholders conferred a benefit on Discover.

61.     Discover knowingly accepted such benefit, to which it was not entitled.

62.     Discover's acceptance and retention of such benefit under these circumstances would be unjust and inequitable.

63.     As a matter of equity and Minnesota common law, Minnesota cardholders should be made whole by application of the doctrine of unjust enrichment.

**RELIEF**

WHEREFORE, the State of Minnesota, by its Attorney General Lori Swanson, respectfully asks this Court to award judgment against Defendants as follows:

1.     Declaring that Defendants' acts described in this Complaint constitute multiple, separate violations of Minn. Stat. §§ 325F.69, subd. 1; and 325D.44, subd. 1; and give rise to a claim for unjust enrichment;

2.     Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from engaging in deceptive practices, or making false or misleading statements, in violation of Minn. Stat. §§ 325F.69, subd. 1; and 325D.44, subd. 1;

3.     Awarding judgment against Defendants for civil penalties pursuant to Minn. Stat. §§ 8.31, subd. 3, for each separate violation of Minn. Stat. §§ 325F.69, subd. 1; and 325D.44, subd. 1;

4.     Awarding judgment against Defendants for restitution under the *parens patriae* doctrine, the general equitable powers of this Court, Minn. Stat. § 8.31, the doctrine of unjust enrichment and any other authority, for all persons injured by Defendants' acts described in this Complaint;

911832.1

5.      Awarding the State its costs, including costs of investigation and attorneys'

fees, as authorized by Minn. Stat. § 8.31, subd. 3a; and

6.      Granting such further relief as provided by law and/or as the Court deems

appropriate and just.

Dated: December _6_, 2010          Respectfully submitted,

                                     LORI SWANSON
                                     Attorney General
                                     State of Minnesota

                                     NATHAN BRENNAMAN
                                     Assistant Attorney General

                                     DANIEL C. BRYDEN
                                     Assistant Attorney General
                                     Atty. Reg. No. 0302284

                                     PETER J. SHAW
                                     Assistant Attorney General
                                     Atty. Reg. No. 0390720

                                     445 Minnesota Street, Suite 1200
                                     St. Paul, Minnesota 55101-2131
                                     651-757-1478 (Voice)
                                     651-296-7438 (Fax)
                                     651- 296-1410 (TTY)

                                     ATTORNEYS FOR PLAINTIFF
                                     STATE OF MINNESOTA